AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

| LODGED |
| CLERK, U.S. DISTRICT COURT |
| 07/26/2024 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ AP _____ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| 7/28/2024 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ D.C. _____ DEPUTY |

United States of America,

v.

ARI AKI YOUNG,

Defendants

Case No.   5:24-mj-00310

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of September 4, 2019, in the county of San Bernardino in the Central District of California, the defendant violated Code Section 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery); 18 U.S.C. § 924(c)(1)(A) (i), (ii) (Possess, Use, Carry, and Brandish a Firearm in Furtherance of, and During and in Relation to, Crimes of Violence); and 18 U.S.C. § 922(j) (Possession of a Stolen Firearm and Stolen Ammunition).

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jarrett Keegan*
*Complainant's signature*

Jarrett Keegan  ATF SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   7/28/24

_____
*Judge's signature*

City and state:   Riverside, ~~Los Angeles~~, California

SHASHI
Hon. ~~Sashi~~ H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lisa J. Lindhorst (x6772)

## AFFIDAVIT

I, Jarrett Keegan, being duly sworn, declare and state as follows:

### I.  PURPOSES OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint against and arrest warrant for ARI AKI YOUNG, ("YOUNG") for violations of 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery); and 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii) (Use, Carry, Brandish, and Discharge a Firearm During and in Relation to a Crime of Violence); and 18 U.S.C. § 922(j) (Possession of Stolen Firearm and Stolen Ammunition), which occurred on September 4, 2019.

2.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of official reports and witness video, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant, and it does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF AFFIANT

3.  I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in San Bernardino, California.  I joined ATF in July 2014.  Before becoming an ATF SA, I was a Federal Air

Marshal with the Federal Air Marshal Service for seven years. During my career in federal law enforcement, I have received extensive training regarding federal criminal law.  My education includes a Bachelor's Degree in Aerospace Studies from Embry Riddle Aeronautical University and a Master's Degree in Security Management from American Military University.

4.    As an SA, I have completed training at the ATF National Academy and the Federal Law Enforcement Training Center related to federal firearms and narcotics laws and regulations.  I regularly refer to these laws and regulations during the course of my duties and have written and participated in the execution of numerous search and arrest warrants for violations of these statutes.  During my career in the field, I have participated in the investigation, surveillance, and arrest of numerous prohibited persons in possession of firearms, as well as firearms and narcotics traffickers, and persons engaged in crimes of violence such as robbery, carjacking, attempted murder, and murder.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On the morning of September 4, 2019, San Bernardino County Sheriff's Department ("SBSD") dispatchers received a 911 call from T.Y., the mother of Ari Aki YOUNG, asking for police to remove YOUNG from her home in Victorville, California. During the call, T.Y. said "Oh my god" repeatedly before abruptly ending the call only to call back minutes later asking for help again.

9.    SBSD Deputy M. Forsberg — a small framed approximately

135-lb female - responded to the call, alone.  T.Y. immediately
emerged from the front door armed with a steak knife. YOUNG
followed close on her heels.  Given T.Y.'s actions, YOUNG's
demeanor, and the nature of the call, Deputy Forsberg tried to
pat YOUNG down for weapons.

10.  YOUNG violently resisted and threatened to "headbutt
the fuck" out of the deputy.  YOUNG then forcefully knocked away
the deputy's baton and began to pummel Deputy Forsberg in the
head and face with his fists.  While being punched in the face
and head, Deputy Forsberg unholstered her weapon and warned that
she would shoot.  Instead of stopping, YOUNG knocked Deputy
Forsberg to the ground and straddled the top of her and grappled
with her, trying to take her gun from her.  During the struggle,
two rounds discharged from the gun.  YOUNG then pinned the
deputy's arm and ripped the gun from her grip.  After he had the
gun, YOUNG stood upright, racked the gun, and pointed it at the
deputy as she staggered to her feet, pled for her life, and
tried to sprint away from him. YOUNG then fired a round towards
her.

11.  After shooting towards the deputy, YOUNG kept that gun
in his hand, racked it again, and walked towards the additional
deputies who had just arrived on scene. YOUNG did not drop the
gun. Instead, he fired another round into the air, which
prompted the deputies to fire at him, hitting him. YOUNG was
given immediate medical attention.  Deputy Forsberg suffered
severe bruising and was medically retired after the incident.

12.  The service weapon and service ammunition that YOUNG

forcefully stole from Deputy Forsberg during the line of duty belonged to SBSD and was manufactured out of state.  SBSD has a large budget and tremendous purchasing power, much of which affects interstate and foreign commerce.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Background**

13.  Based upon my conversations with witnesses as well as other law enforcement officers, my review of police reports, videos and audio recordings, photos, and other materials, as well as my own knowledge of the investigation, I am aware of the following:

**B.    Deputy Forsberg Responds to 911 Call at YOUNG's Residence**

14.  On the morning of September 4, 2019, at approximately 8:25 a.m., SBSD dispatchers received a 911 call for service from T.Y.[1], the mother of Ari Aki YOUNG.  T.Y. asked for police to remove YOUNG from her home on Cabazon Court in Victorville, California.  During the call, T.Y. kept repeating "Oh my god," before abruptly ending the call.  A few minutes later at 8:29 a.m., T.Y. called back and again requested a police response to her home because of her son.

15.  SBSD Deputy M. Forsberg responded to the call, arriving at approximately 8:32 a.m.  Deputy Forsberg -- a small framed approximately 5'08", 135 lb. woman -- arrived alone.  She

---

[1] The true identities of the witnesses referred to in this affidavit are known to law enforcement.  However, to maintain the integrity of the investigation and to prevent witness intimidation, I have not included full legal names in this affidavit.

was in uniform, and in her marked patrol car, which she parked next to T.Y.'s residence.  She initiated her belt mounted audio recorder to capture the interaction.

16.   As Deputy Forsberg walked towards T.Y.'s front door, T.Y. quickly walked outside, armed with a steak knife in one hand and a cell phone in the other.  T.Y. immediately walked around Deputy Forsberg, in an apparent effort to protect herself from YOUNG, who was close on her heels.

17.   YOUNG immediately became combative with Deputy Forsberg, ignoring her requests that he relax.  According to Deputy Forsberg, she  attempted to gain control of the situation so that she could pat him down for possible weapons.  When he refused to cooperate, Deputy Forsberg ordered YOUNG to turn around and put his hands behind his back.  YOUNG responded, "Dude, don't try it.  I will head butt the fuck out of you." Deputy Forsberg told YOUNG he did not want to do that.  YOUNG responded, "Why not," before Deputy Forsberg again instructed YOUNG to relax and put his hands behind his back.  After YOUNG continued to resist, Deputy Forsberg radioed "415," which indicated she had a non-compliant subject.

18.   Deputy Forsberg ordered YOUNG to the ground.  Over the next 20 seconds, YOUNG did not comply and instead continued to argue as Deputy Forsberg reiterated her commands to get on the ground.

19.   Approximately 30 seconds after the "415" call to dispatch, Deputy Forsberg yelled at YOUNG to "stop fighting." She then told YOUNG to "let go . . . let go of my hand or I will

5

hit you!" Then, "Get on the ground.  Get on the fucking ground!"
At no point did YOUNG get on the ground.  Finally, almost a
minute after the "415" call to dispatch, a Deputy Forsberg can
be heard on her audio recorder screaming "Let go of me! Let go!"
with her voice cracking as she repeated the command.

      **C.**    **Neighbor Captures the Violent Encounter on Video**

     20.  According to a neighbor, hereafter "E.S.", the sounds
of this struggle awoke E.S..  E.S. looked out of the window to
his second-floor bedroom and saw YOUNG with both his arms around
the deputy's torso and saw that YOUNG was attempting to take
Deputy Forsberg to the ground.

     21.  According to E.S., within five seconds of waking up,
E.S. began video recording the incident.  The video, which I
have reviewed, begins with YOUNG forcefully resisting and
attacking the deputy on the asphalt just a few feet in front of
T.Y.'s driveway.  Deputy Forsberg's baton can be seen on the
ground, consistent with YOUNG having knocked it out of Dep
Forsberg's grip.  YOUNG's left hand is seen holding Deputy
Forsberg's left hand as YOUNG violently punches Deputy Forsberg
in the face and head repeatedly.

     22.  In the screen shots below, YOUNG (wearing white) can
be seen winding up with his balled right fist above his shoulder
(left image) and then fully extending his right arm and fist as

he punched Deputy Forsberg's face (right image).

 

23.   The deputy's head snapped from left to right as she absorbed the impact. YOUNG continued to land multiple blows to Deputy Forsberg's skull. The deputy then withdrew her service weapon from her holster.

24.   YOUNG then wrestled Deputy Forsberg to the ground and towered over her, as pictured below.



25.   As YOUNG pinned her to the ground and the two struggled for control over the gun, the first gunshot was fired from the pistol.  After that shot, YOUNG continued to try to forcefully take the deputy's service weapon from her grip.  He pinned the pistol to the ground, all while Deputy Forsberg struggled to maintain a grip with both hands on the weapon.  In the screenshot below, YOUNG's left knee can be seen pinning the deputy's arms to the ground, with the firearm's Streamlight weapon mounted light (inadvertently, I believe) activated as



YOUNG's full body weight was positioned over the upper half of the deputy's torso.

26.   As YOUNG struggled for control of the deputy's service weapon, a second round was fired from the gun as it was pinned against the ground.  Less than a second later, YOUNG managed to rip Deputy Forsberg's Glock from her hands.  Deputy Forsberg

yelled, "No."

**D.    Young Fires a Bullet at Deputy Forsberg as She Flees**

27.    YOUNG then took a few steps back with the gun in his hand. Deputy Forsberg, who based on the video appears to have been fatigued by this point, attempted to get to her feet.  With one knee on the ground and her arm stretched out towards YOUNG, the deputy appeared to beg for her life, saying "Please" then "Plea.." as YOUNG pointed the gun directly at her.

28.    As an off-balance Deputy Forsberg got to her feet, YOUNG faced her with the gun in his right head.  Although partially obscured by a tree branch, the pistol in YOUNG's hand appears to snap up quickly, without a round being fired.  The movement of the weapon resembles what commonly occurs with new or inexperienced shooters who anticipate the shot firing, or breaking, as they near the end of the trigger pull.  Realizing the pistol did not fire, YOUNG is then seen pulling the weapon back closer to his body.  As that occurred, Deputy Forsberg got up and ran out of the video frame, away from YOUNG.

29.    YOUNG slowly walked towards the deputy as he racked the weapon's slide, ejecting a live round.  Less than a second after racking the weapon, YOUNG fired one round in the direction the deputy had just run.  Once again, YOUNG racked the slide, ejecting a live round.  The screenshot on the left shows YOUNG with the pistol just before he fired at Deputy Forsberg.  The screenshot the right captured YOUNG racking the pistol just after firing:

 

**E.    Young Walks towards Additional Deputies, Gun in Hand**

30.   YOUNG is seen on video turning his attention to the three SBSD units that were now approaching.  As the units raced down the street with their lights and sirens blaring, YOUNG turned to face them and continued to walk towards them. Although he raised his hands, YOUNG did *not* drop the gun and instead continued to clutch it in his right hand.



31.   Deputy Forsberg yelled, "He has my gun!  He has my gun!"  YOUNG then fired off another round, this time toward the sky.  With the gun still in YOUNG's hand, deputies fired shots towards him, hitting him.  YOUNG finally dropped Deputy Forsberg's pistol and was given immediate medical attention.

**F.    Interstate Nexus of the Firearm and Ammunition**

32.   SBSD officers photographed and processed the scene. Deputy Forsberg's service weapon, pictured below, was a department-issued Glock, Model 17 Gen4, 9mm pistol displaying serial number SSX549.  It was loaded with 12 rounds of 9mm ammunition, including one round in the chamber and 11 rounds in the magazine.  They also recovered the two live rounds YOUNG ejected from the Glock and the four fired cartridge cases.



33.   ATF SA Paul Kirwan, an agent with special training in determining the manufacturing origins of firearms and

11

ammunition, examined photographs of Deputy Forsberg's Glock and all ammunition.  He determined that the Glock and all of the ammunition was manufactured outside the state of California.

**E. San Bernardino County Sheriff's Department's Impact on Commerce**

34.  Because this incident involved the forceful taking of property belonging to the San Bernardino County Sheriff's Department, part of my investigation focused on the impact of this case on interstate commerce.  My investigation revealed that San Bernardino County's 2023/2024 adopted budget total expenditure authority was over $450 million dollars.  As the primary law enforcement agency in the largest county in the country, SBSD consequently has tremendous purchasing power, spending millions annually on vehicles, computers, and consumables like fuel, all of which are procured as part of SBSD's regular operations.

35.  Beyond the somewhat obvious impact on commerce which occurred as a result of the stolen Glock and ammunition, which had to be taken out of service placed into evidence and then replaced by SBSD, I looked at SBSD's budget and impact as a market player – specifically through patrol vehicle and fuel purchases.

36.  During just two fiscal years (2018-2019 and 2019-2020), SBSD spent approximately $6 million on patrol SUVs.  In a similar two-year period (2019 and 2021), SBSD spent $3 million on inmate transport buses.  In another two-year period (2017 and 2018) SBSD spent nearly $18 million on helicopters, all of which

were specially manufactured out of state to fit SBSD's unique specifications.  I also reviewed SBSD's vehicle fuel expenditures for 2019-2020 and 2022-2023, which totaled approximately $3.2 million and $5.9 million respectively.  After conducting interviews and research I learned the automotive fuel consumed by SBSD originates from refined crude oil, nearly all of which is originates out of state, often from international producers.  I also reviewed SBSD's expenditures on mobile digital computers for 2020 alone, the parts of which are manufactured outside California, which totaled over $1 million.

### G.    CONCLUSION

37.  For the reasons described above, there is probable cause to believe that on September 4, 2019, ARI YOUNG committed a violation of 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery); 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii) (Use, Carry, Brandish, and Discharge a Firearm During and in Relation to a Crime of Violence); and 18 U.S.C. § 922(j) (Possession of Stolen Firearm and Stolen Ammunition).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  28th  day of
July, 2024.


HONORABLE ~~CHARLES F. EICK~~ SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE